# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **ROLAND SANDERS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | **Case No.: 2:11-CV-1659-RDP** |
| } | |
| **MICHAEL J. ASTRUE, Commissioner** } | |
| **of Social Security,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OF DECISION

Plaintiff Roland Sanders ("Plaintiff") brings this action pursuant to Sections 205(g) and 1631(c) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his applications for a period of disability and disability insurance benefits ("DIB") under Title II of the Act, and Supplemental Security Income ("SSI") benefits under Title XVI of the Act. *See also*, 42 U.S.C. §§ 405(g) and 1383(c).

### I.   Background

### A.   Proceedings Below

This action arises from Plaintiff's applications for Title II Social Security disability, DIB, and Title XVI SSI, both dated August 17, 2007, alleging a disability onset date of January 12, 2007. (Tr. 73, 95-107, 115). The state agency denied Plaintiff's applications on October 4, 2007, and he submitted a request, signed five days later, for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 75, 87). Plaintiff's request was granted and he appeared before the ALJ in Birmingham, Alabama on October 28, 2009. (Tr. 27-72).

### B.     Plaintiff's Allegations

At the time of the hearing, Plaintiff was 56 years old and had been in school through ninth grade. (Tr. 32). Prior work experience includes work as a construction laborer and custodian. (Tr. 139). Plaintiff alleges that he suffers from hypertension, hepatitis C, and pain in his back and shoulders. (Tr. 35, 37, 40). Plaintiff claims that these impairments prevent him from walking more than a block and a half, standing for more than twenty to thirty minutes at a time, sitting for more than thirty-five to forty minutes at a time, and lifting more than ten to fifteen pounds. (Tr. 35-36). Plaintiff also alleges that he suffers from dizziness resulting from his hypertension, and fatigue resulting from his hepatitis C treatments. (Tr. 37-38).

### C.     Evidence of Record

Records indicate that Plaintiff has regularly received treatment from the Birmingham Veterans Administration ("VA") and was diagnosed with hypertension, hepatitis C, left hip arthritis, and mild osteoarthritis in his back. (Tr. 217, 348, 385, 387-88, 390). A scan of Plaintiff's liver in December 2004 also revealed "stable nonspecific liver lesions" with no evidence of liver damage. (Tr. 344). Ever since his initial diagnosis, records indicate that Plaintiff's hypertension has been well controlled with medication. (Tr. 233, 241, 268, 289, 310, 338, 361, 364, 376, 388, 641, 672, 690, 743, 759).

#### 1.     Hepatitis C

After Plaintiff's initial diagnosis for hepatitis C, the VA followed his condition. CAT scans from 2006 and 2007 showed no stigmata of chronic liver disease, noted that the liver lesions found in 2004 had not significantly changed, and found only borderline cirrhotic configuration of the liver without other signs of cirrhosis or portal hypertension. (Tr. 164-65, 301-03). After the 2007 CAT

scan, Plaintiff refused treatment for hepatitis C unless "really, really necessary," but did agree to a biopsy. (Tr. 286). The biopsy conducted in February 2007 showed chronic hepatitis C with mild activity, as well as focal bridging, perivenular, and perisinusodial fibrosis. (Tr. 277). A CAT scan conducted in March 2008 showed minimal changes in Plaintiff's condition and affirmed previous findings. (Tr. 736). Although Plaintiff had previously declined treatment for his hepatitis C (Tr. 234, 269, 278), at a follow-up appointment in December 2008, it was noted that Plaintiff had no barriers that would prevent him from receiving treatment for his hepatitis C. (Tr. 657).

On February 9, 2009, Plaintiff finally changed his mind and agreed to undergo treatment for hepatitis C. (Tr. 649). Therapy began on April 2, 2009, along with Ribavirin and Pegasys treatments. (Tr. 626-27). At his follow-up appointment, Plaintiff reported that he had experienced flu-like symptoms after his first Pegasys dosage, but reported experiencing no other symptoms. (Tr. 623). Two weeks later, Plaintiff reported experiencing no symptoms. (Tr. 615). Another follow-up in May 2009 showed no changes, but the doctor did note that Plaintiff had missed one dose of Ribavirin. (Tr. 606). However, Plaintiff reported in June, complaining of increased fatigue, but noted no other symptoms. (Tr. 594). By August, progress notes show that Plaintiff's fatigue had stabilized. (Tr. 569). The last progress note on record from September 2009 noted no symptoms relating to Plaintiff's hepatitis C. (Tr. 558-59).

    **2.**    **Hip Pain**

The record also shows that Plaintiff visited the VA several times complaining of hip pain. In 2005, Plaintiff visited multiple times complaining of joint soreness, and the doctor recommended he continue to take Naproxen. (Tr. 337-38). Treatment notes from September show that Plaintiff complained of throbbing left hip pain which worsened with immobility. (Tr. 324-25). The doctor

prescribed Ultram (in addition to the Naproxen) to help with the pain, but noted no limitations in Plaintiff's range of motion.[1] (*Id.*). Plaintiff was sent to physical therapy after continuing to experience hip pain. Although Plaintiff reported a pain level of 4 out of 10, the objective findings revealed minimal degenerative changes at the femoral acetabular joint, a strength level of 5/5, no acute osseous abnormalities, and no complaints of pain upon palpation or upon hip flexion, rotation, or abduction. (Tr. 321-22). In 2006, Plaintiff reported that pain in his left hip was "much improved" after taking Ultram and Naproxen. (Tr. 308). Plaintiff began complaining again of pain in his right hip after a vehicle accident in February 2008. (Tr. 722). X-rays after the accident showed no fractures to his right hip, except for an old "remote" avulsion fracture that was "well corticated." (Tr. 453, 722). At a physical therapy session in November 2008, Plaintiff complained of pain in his right hip, rating it at 8 out of 10. (Tr. 665). However, the therapist noted no "known cause" for such pain, and the objective findings from x-rays only showed the old avulsion fracture and mild degenerative arthrosis of the right hip. (*Id.*).

### 3. Back and Shoulder Pain

Plaintiff also visited the VA on multiple occasions complaining of back and shoulder pain. In January 2006, Plaintiff visited the VA emergency room after allegedly hurting his lower back while lifting furniture. Plaintiff reported that he did not have a history of back pain and that the pain did not radiate to his legs. The examining physician recommended Plaintiff continue taking Flexeril

---

[1] It should be noted that the doctor's notes do not expressly use the words "range of motion" but do contain the abbreviation: "EXTREM- no edema. Nl ROM." (Tr. 325). The ALJ apparently interpreted this to mean "full and normal range of motion." (Tr. 15). Because the ALJ's interpretation is reasonable given the context of the abbreviation, and Plaintiff raised no objection to this issue, the court accepts the ALJ's interpretation.

and Naproxen, and prescribed Percodan for severe pain. (Tr. 313, 315). After undergoing physical therapy, Plaintiff rated his pain level at 0 out of 10. (Tr. 237). Plaintiff also reported that his baseline osteoarthritis pain was "much improved" and controlled by the Naproxen and Ultram. (Tr. 288-89). On March 27, 2007, he returned complaining of lower back pain, with a pain rating of 7 out of 10. He was advised to engage in several home exercises and was issued a heating pad. (Tr. 253-54). Plaintiff returned again in July complaining of ongoing lower back pain that worsened with heavy lifting or sitting for long periods of time. However, the examining physician noted that Plaintiff had not been taking his Ultram and was standing and ambulating without difficulty. The physician also noticed that Plaintiff was "extremely active in the office" and could even hop from a sitting position. (Tr. 232-33).

     Plaintiff returned to the VA on December 12, 2007 complaining of back pain which he rated as an 8 out of 10. (Tr. 764). The attending physician recommended Plaintiff continue his home exercises and medications and prescribed Flexeril for muscle spasms. (Tr. 759). On January 18, 2008, Plaintiff returned complaining of worsening pain in his shoulders that was interfering with his sleep. A physical examination revealed a slight decrease in Plaintiff's range of motion in both shoulders, with minimal pain upon palpation and increased pain with his arm raised. (Tr. 749). The doctor also increased Plaintiff's Tramadol prescription to 100mg. (Tr. 750). Plaintiff returned for a routine follow-up on February 27, 2008, still complaining about bilateral shoulder pain. The attending physician opined that the most likely etiology was musculoskeletal and/or myofascial in origin, and continued Plaintiff's current medications. (Tr. 743-44).

     Plaintiff sought emergency treatment for injuries suffered in a car accident on February 21, 2008. The physical examination and x-rays showed no fractures, but only a mild skin abrasion to

5

Plaintiff's left leg and a muscular contusion to his left shoulder. Plaintiff was discharged with a prescription for Lortab and instructions to ice his shoulder. (Tr. 722). At his follow-up appointment, Plaintiff still complained of pain in his left shoulder. However, the attending physician noted that there was no clear etiology for this reported pain, and that Plaintiff had not been taking his pain medication as prescribed. (Tr. 715). Plaintiff returned on July 31, 2008 complaining of constant pain in his left shoulder with a pain score of 10 out of 10. (Tr. 688-89). The physician noted that the pain did not localize to Plaintiff's shoulder joint, but seemed to localize to the humerus. (Tr. 690). Plaintiff returned on October 8, 2008, with similar complaints. (Tr. 678). X-rays of Plaintiff's right hip and left shoulder from later that month revealed an old and "remote" avulsion fracture in his hip that was "well corticated," and found mild osteoarthrosis in his left shoulder, but "no evidence of fracture, subluxation or dislocation." (Tr. 452-55). In light of these findings, Plaintiff was advised to continue taking Flexeril, referred to physical therapy, and his prescriptions for Naprosyn and Ultram were changed to Diclofenac and Codeine. (Tr. 672).

After being prescribed Tylenol 3, Plaintiff reported in February 2009 that his pain and job performance at the convenience store were doing much better. (Tr. 641). The physical exam also showed that he had full range of motion in his shoulders and full strength throughout. (*Id*.). At two follow-up appointments Plaintiff reported continued pain relief due to the Tylenol 3. (Tr. 615, 623). At his last follow-up on record in September 2009, Plaintiff complained that his back pain was interfering with his sleep, but noted that sleep medication seemed to help. (Tr. 559).

### 4. Administrative Findings and Assessments

On October 3, 2007, the State's Disability Determination Service ("DDS") reviewed Plaintiff's medical file. The DDS determined that Plaintiff could occasionally lift fifty pounds,

6

frequently lift twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and that he was not limited in his ability to push or pull with his upper or lower extremities. (Tr. 396). After reviewing Plaintiff's reported symptoms, the DDS concluded that those symptoms appeared partially consistent with the findings, but did not state whether the alleged severity of his symptoms was consistent. (Tr. 400).

At the request of the Social Security Administration, Dr. Emmanuel Odi performed a physical examination and evaluation of Plaintiff on July 8, 2009. (Tr. 407). The physical examination revealed no serious objective findings relating to Plaintiff's alleged impairments. Plaintiff's gait was slow and steady, he could walk without a cane or walker, and muscle strength in both upper and lower extremities was 5 out of 5. (Tr. 405). Dr. Odi also issued an opinion that Plaintiff's "medical illnesses are such that they will hinder him from performing adequately on the job to hold down gainful employment." (Tr. 406). Dr. Odi opined further that Plaintiff can occasionally to frequently lift eleven to twenty pounds, occasionally carry eleven to twenty pounds, sit for one hour at one time, stand for twenty-five to thirty minutes at one time, walk for fifteen to twenty minutes at one time, sit for a total of three hours per day, stand for a total of one to two hours per day, and walk for no more than one hour per day. (Tr. 411). In regards to Plaintiff's postural limitations, Dr. Odi estimated that Plaintiff can never crawl, kneel, or climb ladders or scaffolds, can occasionally stoop crouch, and climb stairs and ramps, and can frequently balance. (Tr. 413). Dr. Odi also opined that Plaintiff should never be exposed to most environmental conditions, and should only frequently drive a car. (Tr. 414).

### D. The ALJ Hearing & Further Proceedings

Plaintiff testified at the ALJ hearing in Birmingham, Alabama on October 28, 2009 and was represented by counsel. (Tr. 27). Vocational expert ("VE") John Long also testified at the hearing and was asked a series of questions by the ALJ and Plaintiff's counsel. The VE classified Plaintiff's past relevant work as a construction laborer as very heavy, unskilled work, and his work as a janitor as light, unskilled work. (Tr. 46). In answer to the ALJ's hypothetical question involving an individual of advanced age, limited education, confined to a temperature controlled environment, and with the ability to occasionally bend and stoop but never climb or drive, the VE testified that such an individual would not be able to hold down any medium work opportunities, but would be able to perform light work opportunities, such as assembly jobs and packing jobs. The VE estimated that there were as many as 2,000 such assembly jobs and 1,000 packing jobs in north Alabama, as well as 1,000 assemble jobs and 500 packing jobs in sedentary positions. (Tr. 46-47).

In his decision dated February 17, 2010, the ALJ found that although Plaintiff has the severe impairments of hypertension, hepatitis C, and osteoarthritis, he does not have a listing level impairment, and can still perform past relevant work. (Tr. 23-24). Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act, and thus ineligible for disability, DIB, or SSI benefits. (Tr. 24). On March 18, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, (Tr. 1) making that decision the final decision of the Commissioner, and therefore, a proper subject of this court's review. *See* 42 U.S.C. §§ 405(g), 1383(c).

## II. The ALJ's Decision

Disability under the Act is determined under a five-step analysis. 20 C.F.R. § 404.1520(a) (2012). First, the ALJ must determine whether the claimant is engaging in substantial gainful

activity. 20 C.F.R. § 404.1520(b). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.

Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). Absent such impairment, the claimant may not claim disability. Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.

Before proceeding to steps four and five, the ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite his impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. 404.1520(f). If the claimant is determined to be capable of performing past relevant work, then he is deemed not disabled. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.

In the final step of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the

existence, in significant numbers, of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(g), 404.1560(c).

In this case, the ALJ determined that Plaintiff: (1) has not engaged in substantial gainful activity since the onset of his alleged disabilities on January 12, 2007; (2) does have the severe medically determinable impairments of hypertension, hepatitis C, and osteoarthritis; (3) does not have a listing level impairment or combination of impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) has the RFC to perform past relevant work. (Tr. 23). After considering the record, the ALJ determined that Plaintiff retains the RFC "to perform light work which allows him to frequently bend or stoop, perform no climbing, no driving, or working around unrestricted heights or a temperature controlled environment." (Tr. 22). Based on the VE's testimony, the ALJ concluded that Plaintiff has the capacity to return to his past relevant work as a janitor or custodian. (Tr. 23). Accordingly, the ALJ found Plaintiff is not disabled and denied his claim for benefits under the Act. (Tr. 24).

### III. Plaintiff's Argument

Plaintiff requests that the ALJ's decision be reversed and/or remanded, alleging generally that the ALJ's decision is not supported by substantial evidence. (Pl.'s Mem. 8-9). More specifically, Plaintiff alleges that the ALJ's rationale in assessing the credibility of his subjective complaints was not supported by substantial evidence and gave insufficient weight to the opinion of Dr. Odi. (Pl.'s Mem. 6-7).

### IV. Standard of Review

The only issue brought on appeal is whether the ALJ's decision was supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982). Title

42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701. For the reasons set forth below, the ALJ's decision denying Plaintiff benefits is due to be affirmed.

**V.     Discussion**

    **A.     The ALJ's Decision is Supported by Substantial Evidence**

In reaching his decision, the ALJ compared the objective findings on record to the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, as well as Plaintiff's subjective complaints, and concluded that Plaintiff is not disabled nor are his subjective complaints of pain credible. (Tr. 19-22). Plaintiff challenges this finding alleging that the ALJ's decision is not

supported by substantial evidence. (Pl.'s Mem. 6). However, in making his argument, Plaintiff either misreads or misstates both the ALJ's decision and parts of the record.

First, Plaintiff argues that the ALJ was incorrect in stating that he did not "seek all treatment options available to him" for hepatitis C. (Tr. 21). Plaintiff claims that he has a "longitudinal history of treatment" for his hepatitis C, citing seven instances in the record as evidence. (Pl.'s Mem. 6). However, Plaintiff apparently uses the word "treatment" broadly enough that he construes biopsies as actual treatment, rather than as a means of diagnosis. (Tr. 240-41). Disregarding all citations to the record that contain no reference to any actual hepatitis C "treatment" received by Plaintiff, there are only three instances in which the record lists actual treatments Plaintiff received. (Tr. 523, 530, 594).

Moreover, Plaintiff's actual treatments for hepatitis C all occurred in 2009, over five years after his initial diagnosis. (Tr. 385). Contrary to Plaintiff's argument, the ALJ did not conclude that Plaintiff had refused all treatment. Rather, he pointed out that Plaintiff had refused treatment on "multiple occasions" and neglected to seek "all" treatment options available for five years after his diagnosis. (Tr. 21). Accordingly, this longitudinal history of refusal of treatment, along with objective findings that Plaintiff's hepatitis C showed only "borderline cirrhotic configuration of the liver," supports the ALJ's finding that Plaintiff's hepatitis C is not debilitating as Plaintiff alleges. (Tr. 303).[2]

---

[2]Plaintiff also alleges that he suffers from extreme fatigue as a side effect of his hepatitis C treatment. However, the last two progress notes from the VA show that Plaintiff's fatigue had "stabilized" by August 17, 2009, and report no signs of any side effects by September 14, 2009. (Tr. 558-59). Thus, the ALJ's assessment of Plaintiff's hepatitis-related symptoms was supported by substantial evidence.

Second, Plaintiff argues that the ALJ incorrectly discredited his testimony of debilitating back pain and argues that the record evidence corroborates his testimony. (Pl.'s Mem. 7). Plaintiff points to the fact that he was "continually prescribed medication" for his back pain as supporting evidence. (Pl.'s Mem. 7). However, the mere prescription of medication does not necessarily mean that a person is suffering from debilitating pain. As the ALJ correctly noted, Plaintiff's attending physicians never recommended surgical correction or other treatments for his back pain other than prescription medicine. (Tr. 21). The latest VA progress notes from 2009 show that Plaintiff reported his pain was much improved with Tylenol 3, and he had full range of motion and strength in his shoulders. (Tr. 615, 623, 641). Earlier objective findings also showed that there was no evidence or clear etiology that corroborates Plaintiff's complaints of severe back and shoulder pain. (Tr. 452-55, 715). Indeed, VA physicians never found anything other than mild or minimal degenerative joint disease. (Tr. 170, 387-88). Moreover, despite Plaintiff's allegations of debilitating pain, one physician noted that Plaintiff was "extremely active around the office" and could even hop from a sitting position. (Tr. 232-34). In light of the discrepancies between the clinical findings and Plaintiff's description of his impairments, the ALJ's decision to discredit Plaintiff's testimony was supported by substantial evidence. *See Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991).

Finally, Plaintiff alleges that the ALJ erred in discrediting the opinion of Dr. Odi as an examining consultative physician. (Pl.'s Mem. 7). In Dr. Odi's opinion, Plaintiff's "medical illnesses are such that they hinder [Plaintiff] from performing adequately on the job to hold down gainful employment." (Tr. 406). However, Dr. Odi only examined Plaintiff once, on July 8, 2009, and his notes from this examination provide no support for this highly restrictive assessment of Plaintiff's impairments. The examination revealed full muscle strength in both upper and lower extremities,

13

a full, soft, and non-tender abdomen, and noted that Plaintiff could walk "slow and steady" without the aid of a walker or cane. (Tr. 405). The exam notes make no mention of any objective finding that could lead to a conclusion that Plaintiff's illnesses "hinder him" from working and holding down gainful employment. (Tr. 406). When confronted with the opinion of a one-time examiner whose opinion is not supported by the record, an ALJ is fully justified in discrediting that opinion. *See McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); *see also Russell v. Astrue*, 331 F. Appx. 678, 681-82 (11th Cir. 2009) (holding that the ALJ had good cause for affording little weight to an examiner's opinion where the doctor's own examination contradicted his opinion). Here, the ALJ's decision to give little weight to the opinion of Dr. Odi was supported by substantial evidence.

Plaintiff is correct that the ALJ must provide a specific rationale for discrediting his pain testimony. *See Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see also* Social Security Ruling 96-7p ("The determination or decision [of the ALJ] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight . . ."). Because the ALJ reviewed the medical records and cited specific instances in those records that substantially support his credibility finding, that requirement was satisfied, and it is not for this court to second-guess the ALJ's determination or decide the facts anew.

## VI.    Conclusion

The court concludes that the ALJ's decision finding no listing level impairment and discrediting Plaintiff's subjective complaints of pain was based on substantial evidence and proper

legal standards were applied. The Commissioner's final decision is, therefore, due to be affirmed and a separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this      5th      day of September, 2012.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE